CENTRAL TRUST CO. OF NEW YORK v. GEORGIA PAC. RY. CO.
(BROOKS et al., Interveners).

(Circuit Court, N. D. Georgia. December 3, 1896.)

1. RAILROADS—CONSTRUCTION—CONTRACTS—CONTRACTORS' LIENS.
   If, under the Mississippi statute, contractors and material men who have graded and constructed a railroad bed, with masonry work, etc., have a lien which is prior in any respect to the lien of a mortgage executed and recorded prior to the making of the construction contract and the commencement of work thereunder, such priority is limited to the embankments actually thrown up and structures erected by such contractors, as distinguished from the land and the right of way; and, as to these latter, the lien of the bondholders has priority.

2. SAME—EVIDENCE.
   Railroad contractors seeking to assert a lien upon embankments and structures actually erected by them cannot recover anything when they fail to prove what improvements or erections they made, with sufficient detail or certainty of value to authorize any findings for any particular amount.

3. RAILROAD MORTGAGES—RECORDING.
   The record of a copy of a railroad mortgage, instead of the original, on the county records, is not good, as constructive notice; but if the original is actually filed with the recorder for record, and he then compares a copy with the original, and thereafter makes the record from the copy, this is sufficient, and the record operates as notice.

4. EQUITY—SPECIAL MASTER'S REPORT—REOPENING CAUSE.
   After the filing of a special master's report, and taking of exceptions thereto, the court will not allow the cause to be reopened to permit the taking of additional evidence on which to base a recovery, in accordance with the views expressed by the master.

This was a petition of intervention by J. M. Brooks and others in the foreclosure suit brought by the Central Trust Company of New York against the Georgia Pacific Railway Company. The interveners set up an alleged contractor's lien under the Mississippi statute, against certain parts of the road, which they claimed was superior to the lien of the mortgage bonds. The cause was heard on exceptions to the report of the special master, which is here set out in full:

By an order of the circuit court of the United States for the Northern district of Georgia, the above-stated intervention was referred to the undersigned, as special master, for hearing and report. The notice for the time and place of hearing was served on the parties complainant and defendant. Judge Frank A. Critz appeared as counsel for the interveners, and Mr. Henry Crawford appeared as counsel for the defendants.

### Statement of the Case.

The interveners were contractors and builders in the state of Mississippi, and entered into a contract with the Georgia Pacific Railway Company for the construction of a part of its railroad, the obligation being: "To construct and finish in the most substantial and workmanlike manner, to the satisfaction and acceptance of the general engineer of said company, all the graduation masonry, and such other work as may be required on sections numbers 41 to 50, inclusive, on the Third Division of the Georgia Pacific Railway." The work was to be done according to the specifications in the contract, and the specifications, among many other things, provided for the erection of bridges, grading the roadbed, furnishing cross-ties, and many other things, for a particular enumeration of which it will be necessary to refer to the contract which is sent up with this report. The intervention in this case alleged that the interveners were contractors and subcontractors for the work set out in the contract above alluded to, and that they completed their work, and were, under the statute laws of Mississippi, entitled to a first and superior lien as mechanics and contractors, and that, by an adjudication of their rights in a state court in Mississippi, they obtained a decree which fixed their rights as to amount and dignity. A certified copy thereof is attached to the record in this case, and made a part of this report. The defendant filed a general demurrer in this intervention, but, before a hearing thereon was had, that demurrer was withdrawn, and a consent was entered into, which is so material to a clear understanding of the issue presented in this case that a copy thereof is inserted herewith, and is as follows:

"In the Circuit Court of the United States for the Northern District of Georgia, at Atlanta.

"The Central Trust Company of New York, Complainant, vs. The Georgia Pacific Railway Company et al., Defendants (J. M. Brooks, Surviving Partner of R. M. & J. M. Brooks, et al., Interveners).

"We hereby withdraw the demurrer heretofore filed to the intervention petition of said J. M. Brooks, surviving partner, et al., in the above-stated case, and admit the statements of fact contained in said petition to be true. We agree that Exhibit A to said petition is a true copy of the contract between the Georgia Pacific Railway Company and R. M. and J. M. Brooks, under which the work was done for which allowance is claimed in said intervention; that Exhibit B to said petition is a true copy of the original decree, and Exhibit C to said petition is a true copy of the amendment of said decree in the case of R. M. & J. M. Brooks et al. vs. The Georgia Pacific Railway Company, in the chancery court of Oktibbeha county, Mississippi, as stated in said petition; and we agree that said Exhibits A, B, and C may be used as evidence in the trial of all issues presented by said petition, without further authentication or proof of said exhibits. It is further admitted that on the 18th day of August, 1894, Frank A. Critz, as solicitor of said interveners in the city of Atlanta, Georgia, at the time and place appointed for the sale of the Georgia Pacific Railway in the decree in the above-stated case, and at the sale of said railway

under said decree, before any bid was made by the purchaser at said sale, read, in the presence and in the hearing of said purchaser, notice of the claim of said interveners, and of said intervention, as shown by said written notice filed in this case on said 18th day of August, 1894; and it is agreed that said written notice, with the indorsements thereon, may be used as evidence in the trial and disposition of said intervention. The Mississippi statutes referred in said petition need not be pleaded more fully. The above agreement, however, is made subject to the right, which is hereby expressly reserved, to object to any and all matter offered as evidence which may not be material and relevant to the issue in this intervention.

"Signed this November 3, 1894.

   "James Weatherly,

    "Sol'r for Ga. Pac. Ry. and Southern Ry. Co., Purchaser.

   "Henry Crawford,

    "Sol. for Same Parties."

It appears from the intervention filed and the consent above set out that the following are conceded to be the facts in the case:

(1) That the contract was executed.

(2) That the contractors and subcontractors, their rights, position, and situation in respect to the controversy in hand, were properly stated.

(3) That the work by the contractors, under their contract, was commenced about the 23d day of June, 1888, and continued until about November 15, 1888; that the contractors did a very large proportion of the woodwork, earthwork, clearing and grubbing, and furnished a large amount of material for woodwork; and that for a very large portion of said woodwork and material the company had failed and refused to pay and still owes.

(4) That on November 28, 1888, the interveners in this case, being the contractors named in the contract, commenced suit to foreclose a mechanic's lien in the chancery court of Oktibbeha county, in the state of Mississippi, under chapter 53, Code Miss. 1880, as amended by Act March 7, 1882.

(5) That pending said suit a change in the situation of the complainants occurred by death; that proper parties were made, and the cause regularly proceeded.

(6) That a decree was rendered on November 15, 1893, in favor of the complainants in that case, and interveners in this, for the sum of $10,000 principal, and $895.88 costs. This decree declared that the $2,000 which the interveners had deposited to secure the performance of their contract was included in the $10,000 allowed, and that the amount allowed also included the 10 per cent. reserved fund, and all other claims with accrued interest, to which the complainants were entitled. It was provided that the complainants were entitled to a lien on the railway for the amount found in their favor, but restricted it to that part of the railway mentioned in the contract,—to all that part of the railway and right of way in the counties of Clay, Oktibbeha, and Webster, in the state of Mississippi, beginning at a point in Clay county, on said railway, 3,800 feet east of where it crosses the west line of said county, and extending from that point westward 11 miles to a point on said railway, in Webster county, 2,600 feet west of where said railway crosses Spring creek, including all of the sections of the road named in the contract. The decree vested that part of the defendant's property in a commissioner, and provided for a sale. On April 28, 1894, an amendment to the decree was taken, in which the following extension of the scope of the decree was made: In the amended decree above referred to, the complainants were held to have a lien, under the statute above referred to, "upon all the Georgia Pacific Railway in the state of Mississippi, for the payment of all amounts decreed to complainants in said decree; said lien to include, as necessary parts of said railway, all of its rights of way, depots, grounds, yards, tanks, side tracks, roadbed, bridges, culverts, waterways, trestles, rails, freight rooms, and everything else pertaining to said railway as now completed in the state of Mississippi, including that part of said railway described in said decree, and such lien is hereby declared and established; said railway being in the counties of Lowndes, Clay, Oktibbeha, Webster, Montgomery, Carroll, Leflore, Sunflower, Washington, Tallahatchie, Sharkey, and other counties in said state, and extending in a westerly direction from the

eastern line of Mississippi to the Mississippi river." The decree vested all the title in the above-described property in one Charles E. Gay, as special commissioner appointed by the decree for the purpose of enforcing the same. The decree also provided that the railway west of the city of Columbus, known as the "Third Division," that part of it which these contractors worked, extending from Columbus, in Lowndes county, to Greenville, in the county of Washington, and all of its branches connected therewith, might be separated from the balance of the railway without material damage to the property, and the commissioner was empowered to sell all of said railway known as the "Third Division." The amended decree recited that the property was in the hands of the receiver of the United States courts, and the sale was suspended until further orders.

(7) A trust deed was executed, and dated on May 1, 1888, wherein the Georgia Pacific Railway Company conveyed all this property to the Central Trust Company of New York, to secure bonds, and was duly recorded before the contractors filed their contract for record or commenced work.

(8) The road from Columbus east was completed before May, 1888, and had been in operation several years before the date of this trust deed to the Central Trust Company.

(9) No part of the railroad from Columbus west to Johnsonville had been completed when this trust deed was executed, to wit, May 1, 1888.

(10) No part of the Tallahatchie branch was then completed.

(11) All of the main line from Columbus to Johnsonville, 140 miles, and the Tallahatchie branch, about 40 miles, were completed after the deed.

(12) The building of the main line was provided for in the trust deed, and under its terms no bonds could be issued on that 140 miles until the road was completed in sections of ten miles; and, as soon as each ten-mile section was completed, bonds thereon could be issued.

(13) The railway was completed from Columbus west to Suquatouchie creek (about twenty miles) by defendants, November 1, 1888.

(14) No part of the road from said creek west to Johnsonville (120 miles) was completed until after the commencement of the suit in the chancery court.

(15) Interveners did not and do not know when said bonds were sold, or to whom.

(16) The whole of the railroad from Columbus to Johnsonville was constructed about the same time, or the whole of it was in process of construction at the same time, and as one enterprise.

(17) The extension may be separated from that part extending eastward from Columbus without material injury to the property.

(18) The interveners claim a lien on all the railway in Mississippi for $10,000, with interest at six per cent. per annum from November 15, 1893, and costs, and claim that their lien was superior to that of the bondholders. They deny that the bondholders were innocent purchasers or holders of bonds so far as their claim is or was concerned.

(19) Interveners claimed that the eleven miles of road included in their contract is worth $300,000, and that the security of the bondholders is increased by that much; that no work was done on said eleven miles prior to the work done by them; and that they did work and furnished material on said eleven miles of road to about $40,000; that a decree for the balance was due them. They claim that said work was done, and that said material was furnished, with the knowledge and consent and agreement of said Central Trust Company, and that said bondholders received said bonds with the full knowledge of all these facts, and that said work was done and said material was furnished for their benefit. Interveners in the bill ask that said eleven miles be sold for their benefit, and they claim that such sale was ordered by decree of the circuit court of the United States, dated March 27, 1894, for the benefit of them and of the bondholders, and they say that the Central Trust Company is representing the bondholders in this suit.

(20) Interveners charged that the trust company and bondholders were estopped to dispute their lien.

(21) Interveners charged that their claims should have been paid from earnings, and that it was an equitable charge upon all current earnings up to the receivership, and is a charge upon all earnings which have come into the hands of the receivers.

(22) Interveners charge that, under the laws of Mississippi, the lien of the mortgage is subordinated to the lien of the interveners; that the net earnings have been large for 1889, 1890, 1891, 1892, 1893, and 1894, but it is impossible for them to tell the full amount. They charge that all the interest on the bonds have been paid out of the net earnings, and that their money from the 1st of April, 1888, up until the 1st of April, 1892, amounting to about $1,199,600, as shown by the records, had been paid from the earnings of this eleven miles; that, by prorating, an estimate is made that $870,625 was paid from the road in Mississippi, and that $39,592.08 was from said eleven miles. They say that the whole mileage of defendant's road was 553 45/100 miles, and that 241 miles of that total was in Mississippi. On this calculation they claim that they are entitled to preference and payment from the earnings or from the proceeds of the sale.

(23) Interveners claim that a sum of $2,000 was deposited by them on the 9th of June, 1888, to secure the faithful performance of their contract; that it was to be returned unless 10 per cent. reserved under the contract should amount to that sum; but that the railway company, in the improvement of its property, or for current expenses, or to pay interest, converted this $2,000 to its own use; and that said sum was and is a trust fund; and that they are entitled to receive it from the earnings or proceeds of this sale.

(24) That in 1888 and 1889 the road was built between Columbus and Jacksonville, and that in 1889 and 1890 a branch was built from Itto Beno north about 40 miles, and the charge is made that this branch was paid for out of the earnings of the railway, to which earnings they allege that they had a prior claim.

The interveners pray as follows: (1) That the Georgia Pacific Railway Company, the Central Trust Company, and the receivers be made parties to their intervention; (2) that said railway company make discovery of what it did with the $2,000 deposited; (3) that payment of their claim be made in full out of the income or proceeds of the sale; (4) that their claim for principal, interest, and costs be given priority over bonds, and be paid before anything is paid on the bonds; and (5) for general relief.

By the consent above set out, and by the statement of facts made in the intervention, it would appear that the following general facts are agreed to, namely: That a true copy of the contract and true copies of the decree and amended decree of the chancery court of Mississippi are exhibited; that notice of the interveners' claim was given at the sale, and that the purchaser bought with notice; that the defendant admits the statement of facts contained in said petition (intervention under consideration) to be true; that the documents referred to might be used on the heading of this case, subject to the right of objection only as to immateriality and relevancy; and that the Mississippi statutes need not be pleaded more fully.

The contentions of the parties were as follows, on the part of the interveners: (1) That the lien of the bondholders did not attach until the date of their purchase. (a) That the onus was upon them to show the date of the purchase of the bonds, and they failed to show said date, and therefore it cannot be presumed to be prior to the lienors' claim or the commencement of their suit; that the bondholders should be treated as subsequent incumbrancers or purchasers pendente lite. (b) That the presumption from the terms of the trust deed itself, and the date of its record, is that no part of the bonds could have been issued until after the commencement of the work, and hence the bondholders have no claim to be prior incumbrancers, even if the burden of proof as to the date of sale of the bonds were not upon them. (2) That, even if the bondholders are prior in time, then (a) they took the bonds with full notice from the deed of trust of the future liens of the interveners, and with the understanding that said liens should be first satisfied: (b) that they took the bonds during the progress of the work or after the commencement of the suit, and thereby had full notice of the lienors' claims before said bondholders parted with their money, aside from the trust deed or the notice therein contained. (3) That even if the bondholders' rights dated from the deed of trust or its record, and that they had no notice of the future liens of the interveners, then petitioners have priority as to the entire structure of the new extension of 140 miles, and that a court of equity should pay their claims out of the proceeds of the improvement,

allowing the mortgage priority as to the right of way alone. (4) That, if the $2,000 trust fund deposited constitutes no part of the $10,000 decreed, then petitioners are entitled to priority as to that $2,000, outside of the statutory lien, as a matter of equity.

On the part of defendant it was contended: (1) That the interveners' recovery in the state court is inadmissible to establish any claim upon the railroad as against the record mortgage. (2) That, even if the state court decree be accepted as prima facie evidence of its recitals, it does not establish any statutory lien on the railroad which is superior in rank to the foreclosed mortgage. (3) That the court has no power to confiscate any part of the inadequate security of the bondholders, and pay it over to the interveners, because the road was partly constructed on an embankment graded by them, and not fully paid for. (4) That the principle announced in Fosdick v. Schall, 99 U. S. 235, is not applicable to the interveners' claim, and is not entitled to any priority by virtue of that rule.

It is manifest from the argument of counsel that they have different versions of what has been admitted to be true. According to the contention of counsel for interveners, every fact and recital in the intervention, as well as every allegation therein contained, are admitted to be true. For instance, it is alleged that the trustee and the bondholders had notice of complainants' rights and of their lien; whereas, on the other side, counsel for defendant says that, in the absence of an express statute, the holder of a negotiable security is not put on any notice of any matter except what appears on the face of the valid obligation which he buys. Again, it is asserted on the part of the interveners that the work was done and material furnished with the consent of the Central Trust Company, and that the bondholders received the bonds with full notice of all the facts. Defendant's counsel does not concede any such state of facts. Interveners' counsel contends that the contractors furnished material for the construction of the railway, and that a large part of the railway, as it stood when finished on the sections named in the contract, was the creation of these contractors. Defendant's counsel, on the other hand, says: "The intervener brought no material whatever upon the road. He only graded a roadbed. The material which he put into the roadbed belonged to the railroad, and was subject to the mortgage. He furnished no ties, rails, bridges, depots, or any other personalty." Interveners' counsel contend that they were prepared to prove every material allegation in the intervention, but did not do so, because they are admitted to be true, and that every allegation made and not denied is equivalent to an admitted or established fact. Defendant's counsel does not seem so to construe the situation, but to contend that only such things as are stated as facts are to be so treated, and that such matters as allege that the Central Trust Company was the agent of the bondholders, and gave consent, and had notice, etc., and that the holders of the bonds took with notice, etc., were matters of pleading and of deduction and conclusion, rather than facts. The differences crop out all along the line of the able arguments presented to the master by the distinguished counsel on both sides.

### The Real Issues.

It is not so difficult to discover the real issues in this case as it is to properly determine them when found. The controversy might be stated as a sort of "general issue," on the broad question of whether the lien of the contractors who built the road is, under the laws of Mississippi, superior to the lien of the holders of bonds issued under a trust deed recorded before the work was done, and this without specific proof of the time when the bonds were actually sold and put into circulation by the company. There are, however, some intervening questions which must be solved in order to get a proper solution of the general question, and they may be stated as follows:

First: What was covered by the decree and amended decree of the chancery court of Oktibbeha county, Miss.?

Answer: The complainants in the chancery court claimed a lien on the property as contractors and material men under the statutes of Mississippi, and that decree adjudicated every question then pending or existing between the complainants and the defendant, the Georgia Pacific Railway Company. In the case of Buntyn v. Compress Co., 63 Miss. 94 et seq., the court says: "In a suit to en-

force a mechanic's lien, all persons claiming liens on the property sought to be subjected must be made parties; and if another suit to enforce a mechanic's lien on the same property· be already pending, and the petitioner in such first suit be not made a party defendant in the second suit, then his rights are unaffected by sale under a judgment obtained in the latter suit."

Second: What effect had the decree in fixing the status of the two thousand dollars put up by the contractors as a deposit, and for which interveners claim an equitable lien?

Answer: In the opinion of the special master, the chancery court considered the two thousand dollars and the ten per cent. reserve fund as a part of the general demand of the contractors, and that they were entitled, under the Mississippi statute, to a lien therefor, as contractors and material men, and the decree placed the two thousand dollars deposit and the ten per cent. reserve exactly on the same footing as the other part of complainants' demand. It follows, therefore, in the opinion of the special master, that where complainants seek relief in the chancery court, submit their whole case, obtain a decree, and acquiesce in it, and then come into the United States court, and, by way of intervention, set up that decree and the lien it established, they are bound by the status the decree fixed for all their claim; that is to say, if interveners are entitled to have their claim paid by virtue of its dignity as fixed by the decree, they must stand by the decree as a whole, and are not entitled now to have a part of their claim considered under the contractor's lien, and another part as being entitled to the consideration of a trust fund and an equitable preference therefor. The special master, in other words, holds that the whole claim must stand or fall together.

Third: Who are concluded by the decree?

Answer: Only the Georgia Pacific Railway Company was bound by the decree in the chancery court of Oktibbeha county, Miss. Neither the Central Trust Company, the bondholders, nor the purchasers were parties thereto. When this intervention was filed, it was within the power of the parties .now contesting to have called in question, in so far as their rights were to be affected, every feature of that decree,—as to whether or not the complainants were contractors, as to whether or not the amount claimed was due, whether they had a lien, and what was the value and dignity thereof. These defendants did not contest all these questions, and therefore the special master finds that the decree established the fact that complainants were contractors and material men; that they did the work and furnished material as alleged; and that they have a valid and binding decree for $10,000 and costs, amounting to $895.88, and that the sum of $10,000 bears interest from the date of the decree at 6 per cent. per annum from the date of the decree referred to.

Fourth: To what extent can the defendants, in the present shape of the pleadings and of the evidence, be heard to contest the interveners' claim of lien and preference?

Answer: In the opinion of the special master, the defendants can now contest the extent and dignity of the lien in so far as it is claimed to be superior to the lien of the bondholders, and in so far as it is claimed to operate on the whole property within the state of Mississippi. The defendants can contest the lien in every respect as to its superiority over the lien of the bondholders, but, by the agreement, they have admitted all else except the extent and dignity of the lien.

Fifth: Is the lien established by the decree superior to the lien of the bondholders, and entitled to be paid out of the funds raised by the sale of the property under the decree of the circuit court of the United States for the Northern district of Georgia, or, if necessary, out of funds which the court might order raised from the purchasers of the property?

Answer: The statute of Mississippi embodied in section 1378 of the Alabama Code, as amended by the act of 1882, created a lien in favor of contractors and others doing work or furnishing material, for the debts contracted and owing for labor performed or material furnished about the erection and construction or· alterations or repairs, and such debts are declared to be a lien on such building, railroads, or improvements, and on land wherever it stands, including the lot or curtilage whereon the same is erected. This lien was only to take effect as to purchasers and incumbrancers, without notice of such lien from the time of

filing the contract under which such debt was incurred, in the office of the chancery clerk of the county where such land is situated, to be recorded, or of the commencement of a suit in the proper court for the enforcement of the lien. In the controversy with an opposing lienholder, such as a mortgagee, the lien created by this statute appears to be of superior dignity, and all subsequent liens would be postponed to it unless they were liens in favor of purchasers or incumbrancers in good faith and without notice. In other words, if a mechanic or contractor or laborer furnished material and did work upon the land of another, and recorded his lien or commenced a suit therefor, he would have a superior lien to any lien which could be created by mortgage after such record or commencement of such suit. It would appear also that the proper construction of this Mississippi statute leads to the conclusion that the lien given by the section of the Mississippi Code, above referred to, is superior to a pre-existing mortgage in so far as the creation of the thing erected upon the land by such contractor, etc., is concerned; that is to say, if the owner of land executed a mortgage thereon to secure an ordinary debt, the mortgagee would take such mortgage with notice that the state of Mississippi would give a mechanic or contractor a lien superior to his upon a house which such contractor might be subsequently employed by the owner to erect upon the premises. But this lien of the mechanic or contractor would not be superior to the lien of the holder of the mortgage, executed before the building of the house, so far as the land is concerned; and the remedy would appear to be to let the house be sold to satisfy the contractor's claim, and the land could be sold to satisfy the claim of the mortgagee.

In the case of Ivey v. White, 50 Miss. 142, it was held: "Such liens [mechanics' liens] extend to and take hold of the freehold, if such was the nature of the estate, and is superior to subsequent incumbrances." "If there be a prior incumbrance, the lien will be operative on the buildings and erections, but not upon the land itself." "The purchaser under such special judgment acquires the privileges and benefits of the lien, and his title relates back to the lien, and would be superior to a subsequent purchaser." In the case of McLaughlin v. Green, 48 Miss. 175, the court, in discussing the old lien law, which was the act of 1840, says: "Under the mechanic's lien law of 1840, a mechanic or material man has a lien for his labor or materials, prior to all others on the buildings, to the erection of which his labors or materials have been contributed; and, if the buildings have been destroyed by fire, his lien adheres to whatever brick, iron, or other debris may remain." "An older mortgage or other ordinary creditor's lien on the land, even with notice, cannot preclude the mechanic's or material man's liens on the buildings." "The mechanic's lien commences from the time of his contract to do the work, and postpones all subsequent liens or prior liens without notice on the land, and all liens whatever on the buildings." In the case of Buntyn v. Compress Co., supra, the court further says: "In a suit to enforce a mechanic's lien on a structure, for material furnished therefor and work done thereon, it is no answer to the petition for the defendant to say that he has acquired a title to the property sought to be subjected, by virtue of a sale under a deed of trust executed by the owners of the property, since the institution of the suit." In the same case it is further said: "Where A. has a prior lien on property under a deed of trust, and B. has a mechanic's lien on the same property, B. is entitled to enforce his lien by sale of the property, subject to the paramount lien of A." In the case of McAlister v. Clopton, 51 Miss. 257, the court says: "The lien of the mechanic is subordinate to a prior incumbrance so far as respects the land, but is nevertheless valid against the building." The special master can find no Mississippi case which contravenes the doctrine above set forth. It is also confidently believed that when cases can be found which hold that liens created by statutes in favor of contractors, material men, and mechanics have been held to be superior to pre-existing trust deeds and mortgages, duly executed and recorded, there will also be found statutes so declaring at the time of the execution of such deeds or mortgages; and these instruments are presumed to have been made with respect to such enactments, and these enactments are held to have been in contemplation of the parties. The special master so construes the case of Brooks v. Railway Co., 101 U. S. 443. It appears to the special master that the contractors (interveners here) did furnish material and make substantial improvements on the sections of the railway named in the contract. It seems to be in the mind of the defendant that

all the interveners did was to dig up the earth, and move it from one place to another, in grading the roadbed, and to prepare and place in position material furnished by the railway company. These contentions are not sustained by the evidence, and to the mind of the master the defendant has admitted the contrary to be true.

The special master finds that, under the law applicable to this case, the interveners have a lien upon the improvements they made and created on the sections of the railway named in the contract, and that such lien was superior to the lien of the bondholders of either issue of bonds. But what exact improvements were made, their exact kind, character, extent, or value, is not shown, and, according to the testimony produced, cannot be determined. The value of their work must have been proven in the chancery case, which resulted in the decree for a balance of ten thousand dollars; but what the improvements or creations made by them disconnected from the realty and the right of way were does not appear; nor is the pro rata value of improvements by interveners to the value of any other improvements or property shown. The special master holds that, under the facts disclosed upon the record, the trust deed which was executed to secure the bonds was recorded before the work was begun or the suit commenced to enforce the lien of the contractors; and it would therefore follow that as to the land,—the right of way,—the lien of the bondholders would be superior to the lien of the contractors. The interveners contend, however, that this cannot be the true state of the case for two reasons. One is that, at the time the trust deed was executed, the line of road at the point in question had not even been procured or located, and there was nothing to which the mortgage could attach, and that the mortgagees were in no sense incumbrancers in good faith for valuable consideration, and without notice, because no suit could have been started until the work was done, and no contract could have been filed for record before the execution and record of the trust deed, on account of the very nature of things and the situation of the parties. The interveners also confidently contended that, by the very provisions of the mortgage, its lien could not attach to newly constructed road until each ten miles of railroad was completed, and, therefore, that the whole scheme of building the road was founded on the idea of employing contractors, laborers, and material men to create in sections a property upon which the owners of the corporation could hang a credit, attach a lien, and issue bonds to pay for the construction. To the mind of the special master these contentions of the interveners appeal strongly to the sympathy of a court, and to a sense of justice, as the facts are reviewed in the light of subsequent events, when the railway company has become insolvent, and many honest and perhaps needy creditors must lose what they are in law and in equity entitled to receive. As such, we might instance these contractors, who have established the performance of their contract, and have procured a decree of a court of chancery setting up their rights. But, at the time these contractors undertook this work, they knew, or are presumed to have known, that the other contracting party had executed a mortgage on its railway, and it does not violate a reasonable presumption to infer that, as railroad contractors, they might have known that this manner of building railroads was, to say the least, not uncommon. So, it would seem that while the right of way had not been located or procured when the mortgage was executed, or even when it was recorded, yet, before any work could be done by these parties, the road must necessarily have been located, and the right of way procured. Therefore, it would seem that if these contractors had notice of the existence of the mortgage, such as they were required to take under the law, they would have gone to work to construct a railroad upon a right of way covered by an existing mortgage with the certainty that, if they did their work on credit, they would have to rely upon the lien which the law gave them for the collection of their debt, and take chances of a collision between their rights and those of other creditors.

The interveners make as a further contention that the mortgagee and the bondholders who took their securities under the trust deed or mortgage knew that, at the time they were so acting, the railway company had not even procured the right of way, but that it did intend to construct a railroad upon it, when so obtained, by the employment of contractors, material men, and laborers, and that, necessarily, a debt was to be created which would be superior in law and in equity to their claim. To the mind of the special master it does not

appear that the mortgagee or those it represented would necessarily know that a debt was to be created. If the bondholders paid their money for the bonds, could they not reasonably conclude that the mortgagor would use cash, even the cash they paid, to build and pay for other sections of the railroad? As the special master understands this case, there is not only no evidence to show when the holders of these bonds obtained them, but no evidence as to whether they purchased them from the Georgia Pacific Railway Company or from other holders. The general rule seems to be that the holder of a negotiable security, in the absence of express statute, is not put on notice of any matter except what appears on the face of the valid obligation he buys; and in the purchase of a negotiable bond, if the purchaser examined the trust deed, and saw it was in due form, properly executed and recorded, it would not appear to be necessary for him to enter upon the mortgaged premises, and see whether any building to which superior liens might attach had been erected thereon, unless there was a public statute, which he was bound to notice, declaring that a lien would exist on the realty in favor of a contractor or mechanic who should do work in the erection of buildings thereon. The special master therefore concludes on this point that the bondholders, under the evidence produced in the case, are not affected with such notice as would give the interveners a lien on the right of way, or on such parts of the roadbed as was not the creation of the contractors, superior to the lien of the bondholders who hold bonds under a trust deed or mortgage executed and properly recorded before the commencement of the work.

Another contention of the interveners is that they have a lien upon the whole road within the state of Mississippi. In respect to this contention, the special master interprets the law to be that they would not have a lien on that part of the road east of Columbus, because that part of the line seems conceded to be capable of distinct and complete severance from the other part; and this lien would exist only in the event that the lien of the interveners attached to the realty as well as to the buildings and erections placed thereon. In some cases holding a contrary view there was a statutory lien given on the whole property. In the view of this matter taken by the special master, however, it is unimportant to consider whether this lien could, in any event, attach to the whole road in Mississippi, or to that part east of Columbus, as the special master holds that, under the law, the lien of the interveners was only superior to the lien of the bondholders for the improvements and erections made by them upon the sections of the railway named in the contract.

### Findings.

The special master finds and reports as follows:

(1) That the interveners, as contractors, have a lien set up and established by the decree set forth in the record of this case, which is superior to the lien of the bondholders only as to the improvements and erections placed by them on the railroad right of way.

(2) That the lien of the bondholders is superior to the lien of the interveners upon the realty composing the right of way and substructure of the railroad, as distinguished from anything like depots, bridges, cross-ties, culverts, or rockwork which the interveners may have furnished and erected.

(3) The proof does not show what work, improvements, or erections the interveners did on the line of road covered by their contract, with sufficient detail or certainty or value to authorize any finding in their favor for any particular amount, and therefore the special master is forced to find against their claim as presented and proven in the proceedings in this case.

(4) The special master finds that it would be destructive of the interests of the defendant railway company and of the interveners and of the purchasers to allow the improvements, whatever they were, erected by the interveners, to be detached or moved away from the premises; and therefore they should have been and were sold together, and whatever was the reasonable value of such improvements and erections has passed ratable into the common fund.

(5) The railway east of Columbus, Miss., was not subject to the lien of the interveners, and therefore should not be taken into account in estimating the pro rata value of the improvements and erections made by interveners.

Respectfully submitted,                    W. D. Ellis, Special Master.

Critz, Becket & Jones, for interveners.
Henry Crawford and Glenn, Slaton & Phillips, for defendant.

NEWMAN, District Judge. The able and complete report of the special master renders unnecessary any elaborate discussion of this case in disposing of the exceptions filed by the interveners to the report. I am satisfied that, if the interveners had any lien at all, it is not more extensive than that stated by the special master; that is, upon the work done and improvements made by these contractors. It was stated in the argument for the interveners that the special master did not give a lien upon the embankment thrown up and constructed by the contractors, but this is not sustained by an examination of his report. If it was, I should differ with him as to that, because it seems to me clear that the embankment is as much a part of the improvement made by the contractors to the railroad as is the woodwork, masonry, etc. Construing the report in this way, or modifying it, if necessary, so as to give it this effect, I would make that the limit as to the property of the defendant upon which a lien would be given having preference over the bondholders. The third paragraph of the intervention in this case is as follows:

"That said R. M. & J. M. Brooks commenced said work about the 23d day of June, 1888, and they and their subcontractors worked from that day till the 14th or 15th day of November, 1888, under said written contract, and did a very large proportion of the woodwork, earthwork, clearing, and grubbing upon said sections 40 to 50, inclusive, upon said railway, and furnished a large amount of material for the woodwork thereof. That, for a very large portion of said work and material, said company failed and refused to pay, and there is still due the petitioners herein a large balance for said work and material."

So, it seems that interveners claim to have done only a "large proportion" of the work on sections 40 to 50, inclusive. This complicates the matter, but, even if they did the entire work on these sections, there is no evidence whatever as to the proportionate value of that part of the road on which they worked, to the whole road in Mississippi; nor is there any evidence, if we consider the part of the road on which they worked alone, as to the proportion their work bears to the aggregate value of the property as it stood after the work was done,—that is, the right of way with this work on it; nor is there any evidence as to the proportion these contractors' work bore to the railroad when completed, when the cross-ties and rails were added. Some evidence of this sort is absolutely necessary to the determination of the case, assuming them to have such superior lien as the special master finds. Of course, the work done by them cannot be severed physically from the other part of the road. Necessarily, therefore, there must be proof of the kind suggested to enable the court to make an intelligent disposition of the matter, or to render any proper decree in favor of these interveners.

There was an agreement by counsel for the defendants that the facts set out in the intervention were true. It is claimed that by this agreement certain admissions were made as to the value of the work done and the improvement made on the road by the interveners. It is denied, on the other hand, that the agreement goes to the extent claimed. The special master, before whom this agreement was made,

seems to be doubtful as to its extent and effect.    But, even if it be
given the full effect contended for by the interveners, it does not re-
lieve the difficulty which has been mentioned as to the relative value
of the improvement made and the remainder of the road.    In the third
finding by the special master, he says:

"The proof does not show what work, improvements, or erections the inter-
veners did on the line of road covered by their contract with sufficient detail or
certainty of value to authorize any finding in their favor for any particular
amount; and therefore the special master is forced to find against their claim
as presented and proven in the proceedings in this case."

Approving this view of the case taken by the special master, I must,
for the reason he gives, as well as for the reasons above stated, concur
with him in the final conclusions reached in the report.

As the foregoing view of the case controls it adversely to the inter-
veners, it is unnecessary for me to pass upon the question as to wheth-
er or not the interveners have any lien whatever superior to that of
the bondholders secured by the trust deed.    It has been a question of
grave doubt with me, since the case was first presented here, as to
whether these interveners have had any such preference over the
bonds.    It would be unnecessary to allude to this matter at all except
that I do not wish to be understood as deciding that question.    I only
hold that, if a lien exists, it does not go beyond that allowed by the
special master, and that there is no evidence by which a lien of that
kind can be given any practical effect in favor of the interveners.

Counsel for the interveners, during the argument of the case, sug-
gested their desire to amend, and to apply for leave to offer further
evidence, in the event the court should differ with them.    For this
reason, no order overruling the exceptions and confirming the report
will be entered until they may have the opportunity which they desire,
at an early date, to make their motion, and have it determined.

## On Application of Interveners for Leave to File a Supplemental Bill.

### (April 10, 1897.)

At the stage of this case indicated by the closing paragraph of the
former opinion rendered herein, on the 3d day of December, 1896,
interveners' counsel came before the court, and asked leave to file a
supplemental bill, or petition in the nature of a supplemental bill,
making a new question in the case, and to set up new facts which they
did not know until recently, notwithstanding the exercise of what
they claim to be due diligence on their part.    It has been assumed
all along in this case that the mortgage with which the interveners
were contending as to priority was properly admitted to record in the
various counties of Mississippi in which its record was material.
They now desire by their supplemental bill to make the question that
the mortgage was not properly recorded, and did not operate as con-
structive notice, for the reason that the copy, instead of the original
mortgage, was admitted to record in each of these counties.

On this question of the record of a copy of a mortgage, instead of
the original, on the county records kept for that purpose, the authori-
ties seem to be unanimous, and to the effect that such record is not

good as constructive notice. To that effect, see Blight v. Banks, 6 T. B. Mon. 192; Lewis v. Baird, 3 McLean, 56, Fed. Cas. No. 8,316; St. John v. Conger, 40 Ill. 535; Lund v. Rice, 9 Minn. 230 (Gil. 215); Marsden v. Cornell, 62 N. Y. 215; and Stevens v. Brown, 3 Vt. 420.

An extract from the case of Porter v. Dement, 35 Ill. 478, will suf- ficiently give the view taken by the courts of this question, and the reasons for the same:

"The original mortgage is required to be recorded in the recorder's office, and it is the duty of the recorder to correctly transcribe the same. To do this, he must have the original before him. The law has made no provision for authenti- cating to the recorder a copy of such mortgage. He has no authority to transcribe a supposed copy of such an instrument on the records of his office. He is not responsible for the correctness of any such transcript. A copy or dupli- cate mortgage was not, and does not appear to have been, acknowledged as the law requires, and for that reason is invalid as an original mortgage. The jus- tice has no authority to certify that it was a copy. A certificate of the mort- gagor or of the chairman of the board of supervisors, or a letter from an ac- quaintance, would have been as effectual to authenticate a copy of the mortgage as the certificate of the justice. The recorder did not know whether the copy was a correct one or not. He had no authority to record it, and, when tran- scribed, it would appear to the world as a transcript of a paper which some estimable gentleman supposed to be a copy of the mortgage. We think this is not such a recording of the original mortgage as the statute requires."

In response to the rule to show cause why the interveners should not be allowed to file their supplemental bill, the defendant brings into court the original mortgage, with entries thereon of its filing and record in each of the counties material here, giving the day and the hour of such filing. In addition to that, they produce the affidavit of one Robert R. Brown, who testifies that he, in person, carried the original mortgage to each of the counties through which the road ran in Georgia, Alabama, and Mississippi, and that he filed the original mortgage with the several clerks, and that the entries of the clerks thereon were made in his presence. Some affidavits are produced by the interveners which tend to show, and indeed, I think, do show, to- gether with the other apparent facts in the case, that while the origi- nal mortgage was filed for record, and the entry of record made there- on, the actual work of entering the mortgage on the record book was done from a printed copy of the original mortgage. None of the cases above cited have in them the facts presented for determination in this case. In each of those cases it was the clear-cut question of the rec- ord of a copy of a deed or mortgage, pure and simple. In one of the affidavits presented here, it appears that the clerk compared the printed copy of the mortgage presented to him with the original mort- gage sufficiently to satisfy himself that it was a true copy; and this, it would probably be fair to assume, in view of the usual presumption as to the proper discharge of official duty in the absence of evidence to the contrary, was done by all the clerks who made these entries on the original mortgage.

I have given very careful consideration to the question presented on the application to reopen this case by the filing of a supplemental bill. The question involved has not, so far as I am aware, ever been pre- sented to the courts of this state in any shape for determination. The facts brought out by the answer to the rule to show cause are not

seriously questioned, except with the qualification I have suggested as to the actual work of record having been done from a copy. The transaction, I think, must be taken to have occurred in about the way that has been stated. In this view, and determining the case upon this state of facts, and conceding the law to be as announced in the decisions referred to, I do not believe that in this case it is the record of a copy of the instrument, but it must be held to be the filing for record and the record of the original in a manner satisfactory to the clerk, and reasonably necessary under the circumstances, considering the character of the mortgage and the property it covers, and sufficient in law. To allow this case to be reopened, and the interveners to take additional testimony, and to go to further expense, would be wrong, when I am satisfied that they can obtain no final benefit thereby. If there was any substantial dispute as to the real facts in the matter, notwithstanding the lapse of time and the long trial in this case upon other issues, I might feel it my duty to allow the interveners to file their supplemental bill, and be further heard; but in view of what must be recognized as the truth of the transaction, and, indeed, what I understand to be recognized by counsel on both sides, the application to file their supplemental bill must be denied.

Another ground has been urged for reopening this case, and that is to take additional evidence on which to base a recovery in accordance with the views expressed by the special master in his report, and which was concurred in by the court. To allow the case to be reopened for this purpose would violate the precedent established in this court, and cannot be allowed. Clyde v. Railroad Co., 59 Fed. 394; Central Trust Co. v. Richmond & D. R. Co., 69 Fed. 761.